IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID PRICE,

                    Plaintiff,

         v.

UNITED STATES OF AMERICA,

                    Defendant.

Case No. 20 C 1184

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendant David Price moves to vacate, set aside, or otherwise correct his sentence pursuant to 28 U.S.C. § 2255. (Civ. Dkt. No. 1.) For the reasons stated herein, the Court denies the Motion. The Court finds that a certificate of appealability is not warranted.

## I.  BACKGROUND

Defendant David Price challenges his 2014 criminal convictions for (1) conspiracy to possess with the intent to distribute heroin; (2) knowingly and intentionally using a telephone in committing and in causing and facilitating the commission of a felony; (3) money laundering; and (4) being a felon in possession of a firearm. Jury Verdict, United States v. Price, No. 12-CR-00587 (N.D. Ill. Mar. 12, 2014), Dkt. No. 104. Unless otherwise indicated, citations in this section correspond with the docket for that criminal case.

In July 2012, Price was indicted for various offenses related to his participation in a drug conspiracy. (Indictment, Dkt. No. 6.) In July 2013, the Government filed a superseding indictment that included the following counts: (1) one count of conspiring "to knowingly and intentionally possess with intent to distribute" one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 846; (2) two counts of knowingly and intentionally using a telephone "in committing and in causing and facilitating the commission of a felony"; (3) one count of "conspir[ing] with others to conduct financial transactions affecting interstate commerce, the proceeds being from unlawful activity, knowing that the transactions were designed to conceal and disguise the proceeds"; (4) nine counts of money laundering; and (5) one count of being a felon in possession of a firearm. (Superseding Indictment 1–13, Dkt. No. 57.) Price entered a plea of not guilty and proceeded to a jury trial in March 2014. (Dkt. No. 85.) Six days into the trial, on the Government's motion, the Court dismissed one of the two telephone charges against Price. (03/11/14 Tr. 1247:10–11, Dkt. No. 165.) On March 12, 2014, a jury convicted Price of all remaining charges. (Dkt. No. 104.) In October 2017, the Court sentenced Price to thirty-seven years' incarceration. (Dkt. No. 153.)

## A.  Opening Statements

During opening statements, the Government introduced Price as the head of a heroin distribution conspiracy that operated on the West Side of Chicago from 2005 until 2011. (03/04/14 Tr. 179:10-12, Dkt. No. 160.) The Government asserted that Price controlled how the heroin was mixed with other substances, how the heroin was distributed on the streets, and how profits of the heroin sales were shared among the co-conspirators. (*Id.* at 179:12-15.) Price's income from the successful heroin conspiracy made him a millionaire and, as a result, his friends and family made large purchases on his behalf to hide his "dirty cash." (*Id.* at 179:18-21, 181:16-22.)

The defense utilized a partial admission strategy throughout trial, beginning with its opening statement. Defense counsel made the following concession to the jury:

> Ladies and gentlemen, David Price did sell heroin. He isn't going to deny that. He isn't going to try to dispute it. It's simply the truth. David Price was a businessman, and his business was buying heroin and reselling it for a profit. He had a source of supply where he was able to obtain heroin, and he sold that heroin to other drug dealers who were willing to pay his price.

(03/04/14 Tr. 184:22-185:3.) While defense counsel admitted that Price was a distributor of heroin, he maintained that Price worked individually rather than as part of an elaborate conspiracy. (*Id.*

at 184:22–186:12.) The defense made the following distinction to the jury:

> [B]uying heroin and then reselling it for a profit, even if you know that it's going to be resold later, that isn't enough to constitute a conspiracy. In order to be guilty of a conspiracy, the government has to prove that David Price had an agreement about the distribution of heroin with these other parties, and they're not going to be able to prove that because David Price wasn't involved in any conspiracy.

(*Id.* at 186:5–12.)

The defense was even more direct about the money laundering charges. The defense described to the jury the way in which Price directed his friends and family to make expensive purchases for Price under their names and explained, "when somebody does that, that's the crime of money laundering, and that's another crime that David Price did commit." (03/04/14 Tr. 186:21–23.) Near the end of opening statements, defense counsel acknowledged that Price expected to be found guilty of the money laundering charges but said, "[W]hat he doesn't expect is for you to find him guilty of a charge that he did not commit under the law, the charge that he was involved in a heroin conspiracy." (03/04/14 Tr. 187:7–10.)

The defense ended its opening statement by saying Price was "guilty of multiple distributions to multiple different drug dealers" but maintained that Price was innocent because those are not the crimes with which he was charged. (03/04/14 Tr. 195:4–12.)

## B. Government's Case in Chief

### 1. Drug Conspiracy

To prove its charge of drug conspiracy, the Government called James Brown, Mokece Lee, and Joenathan Penson to each testify that they participated in a conspiracy to distribute heroin with Price. (03/05/14 Tr. 262:20–263:4, 442:4–443:16, Dkt. No. 161; 03/06/14 Tr. 713:20–714:9, Dkt. No. 162.) According to the testimony, Price supplied the members of the conspiracy with heroin that they mixed, bagged, and distributed throughout the West Side of Chicago. (03/05/14 Tr. 267:16–268:24, 280:6–281:25; 03/06/14 Tr. 486:2–487:24, 524:1–11, 594:1–18, 721:3–10; 03/07/14 Tr. 806:1–2, Dkt. No. 163.) Price supplied heroin "on credit" and engaged in a profit-sharing rotation in which Price kept the profits of the heroin sales fifty percent of the time, and the co-conspirators who made the sales would keep the profits the other fifty percent of the time. (*See, e.g.,* 03/05/14 Tr. 282:14–20; 03/06/14 Tr. 488:22–492:1, 507:23–25, 721:21–723:6.)

The Government also elicited testimony explaining that Price's heroin was distinct from other black-market heroin. First, Price cut his heroin with Dormin, a sleeping pill, using a specific recipe — five grams of raw heroin mixed with thirteen grams of Dormin. (*See* 03/05/14 Tr. 480:2–8; 03/06/14 Tr. 682:17, 724:13; 03/07/14 Tr. 745:16–746:2, 766:2–5.) The resulting mixture was

also bagged in a specific manner. (*See, e.g.,* 03/05/14 Tr. 280:6–17, 450:6–8.) The heroin was branded with a piece of tape to make Price's high-quality product easily recognizable on the street. (*See* 03/05/14 Tr. 281:8–25, 480:9–23, 482:6–12; 03/06/14 Tr. 550:17–22, 687:2–8, 725:12–18.) Price hired workers when business increased, and he trained them to mix and bag the heroin in the way he preferred. (*See* 03/05/14 Tr. 285:14–17, 449:23–450:3; 03/06/14 Tr. 507:18–20, 516:22–518:16; 03/07/14 Tr. 746:13–747:15.) The person whose turn it was to keep the profits during a particular transaction was responsible for paying the workers. (*See* 03/06/14 Tr. 500:2–25, 508:12–22, 595:19–24; 03/07/14 Tr. 747:6–749:2.)

The witnesses additionally identified an apartment known as "Up Top" as the location where Price's heroin was mixed and bagged (*e.g.,* 03/06/14 Tr. 521:18–522:11; 03/07/14 Tr. 756:12–13). Surveillance footage showed Price using a key to enter Up Top, and it was understood that Up Top was Price's apartment. (*See* 03/04/14 Tr. 210:19–211:7; 03/06/14 Tr. 711:5–712:6; 03/07/14 Tr. 756:5–23.) Price controlled access to the apartment and gave certain individuals keys, while others had to call to have the door opened by someone who was already inside. (*See* 03/05/14 Tr. 298:18–19, 311:1–9; 03/06/14 Tr. 527:3–528:6, 538:12–25, 540:17–541:3, 544:12–18; 03/07/14 Tr. 758:6–18, 764:7–18.) The Chicago Police

Department ("CPD") pulled trash from the garbage cans outside Up Top for six consecutive weeks from late 2007 until early 2008 and recovered items often used in the mixing and bagging of heroin, including sandwich and storage bags, scissors, aluminum foil containers, empty spools for scotch tape, and Dormin packaging. (03/05/14 Tr. 407:18-22, 411:7-412:24.) The defense stipulated that items from the CPD trash pulls contained Dormin and heroin residue and that Price's fingerprints were found on a tequila box also recovered from the trash pulled by the police. (*Id.* at 435:3-20, 437:4-438:17.)

The Government also introduced evidence that Price, in an attempt to preserve his drug operation, wanted to kill a co-conspirator that he suspected was cooperating with a law enforcement investigation. In late 2007, James Brown gambled away money that he owed to Price as part of the heroin distribution scheme. (03/05/14 Tr. 328:13-14.) Around the same time, Brown stopped visiting Up Top regularly, and he told other co-conspirators that he suspected law enforcement was watching the apartment. (03/06/14 Tr. 559:13; 03/07/14 Tr. 788:1-5.) Price told Joenathan Penson that he thought Brown was working with law enforcement. (03/07/14 Tr. 787:11-21.) Price stopped supplying heroin to Brown directly and, instead, instructed Brown to retrieve it from other co-conspirators. (03/05/14 Tr. 330:3-9; 03/06/14

Tr. 561:4-25.) To resolve the money dispute and Brown's cooperation with law enforcement, Price expressed a desire to "do something to" Brown. (03/07/14 Tr. 788:16-23.) Penson revealed that two other co-conspirators who went by the nicknames "Black" and "Bleek" volunteered to shoot Brown for Price. (03/07/14 Tr. 789:13-19.) In January 2008, Brown was shot in the leg by two masked men (03/05/14 Tr. 335:4-20, 380:1-10.) When Price learned that Brown survived the shooting, he called Black and Bleek "amateurs" and said that he should have shot Brown himself. (03/07/14 Tr. 799:3-9.)

At trial, defense counsel made the following objection to the Government's introduction of evidence of Brown's shooting:

> I believe the government intends to introduce evidence that Mr. Brown was shot and then through subsequent cooperators, introduce evidence that Mr. Price had something to do with the shooting because Mr. Brown owed Mr. Price money. It's our position, Judge, that this evidence is unfairly prejudicial. The prejudicial impact of bringing up a shooting in a drug conspiracy case of this kind far outweighs any probative value that it would have in terms of establishing the actual conspiracy.

(03/05/14 Tr. 256:25-257:8.) The Court admitted the evidence. (*Id.* at 257:21-258:11.)

### 2. *Using Telephone in Commission of a Felony*

Under 21 U.S.C. § 843(b), it is "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act

or acts constituting a felony." A telephone falls within the definition of a "communication facility."

In order to prove the use of a telephone in commission of a felony, the Government introduced evidence of an intercepted call during which Price asked a co-conspirator if he needed more heroin. (03/06/14 Tr. 534:11–21.) Price also made a call to a co-conspirator asking if he had Price's money ready. (03/06/14 Tr. 567:5–568:17.) During a separate phone call, Price directed a co-conspirator who needed more heroin to get it from someone else who had a supply from Price. (03/07/14 Tr. 782:20–783:13.)

### 3. Money Laundering

The Government presented evidence of money laundering by demonstrating that drug dealing was Price's sole source of income. Witnesses who had known Price since he was a child testified that they could not recall a time when Price held legitimate employment. (03/06/14 Tr. 589:2–7, 03/07/14 Tr. 915:22–916:1.) For example, between 2003 and 2004, Dorothy Spann hired Price for a construction job but fired him after just six months. (03/06/14 Tr. 706:16–708:21.) After his termination, Price asked Spann to keep him on the payroll and allow him to reimburse her in cash for the paychecks he received thereafter. (*Id.* at 708:22–711:4.)

Despite his lack of employment, Price possessed multiple luxurious items including a customized Harley-Davidson motorcycle,

vehicles, residences, diamond jewelry, designer apparel, and was often in possession of large quantities of cash. (*See, e.g.,* 03/06/14 Tr. 583:25–586:23; 03/07/14 Tr. 828:1–831:22, 957:11–16, 968:1–4, 973:3–22, 980:6–25; 03/10/14 Tr. 1046:5–1048:23, 1071:21–1072:12, 1094:5–1095:3, 1104:11, Dkt. No. 164.) Price enlisted the help of his friends and family when he made his larger, more significant purchases. The defense stipulated to at least five residences that were leased to individuals other than Price, despite the fact that Price was found to be the primary resident of each. (03/10/14 Tr. 1167:5–1176:1.) Price's father, David Price Sr., testified that Price asked David Price Sr. to place a Corvette, a Country Club Hills home, a Naperville apartment lease, a motorcycle, and rental cars in David Price Sr.'s name. (03/07/14 Tr. 917:17–948:22.) When David Price Sr. agreed to the arrangement, Price provided his father with cash to reimburse him for the various monthly payments. (*Id.* at 922:5–8, 925:5–928:10, 932:17–19, 940:1–22, 947:19–948:22.) Price's sister, Charisma Tabor, let Price place two vehicles and the vehicle loans in her name, and Price gave her cash every month to pay off the loans. (03/10/14 Tr. 1122:19–1132:3.)

The Government "par[ed] down" its evidence of money laundering based on the defense's opening statement. (03/05/14 Tr. 256:6–9.) In its closing argument, the Government relied upon

the defense's concession and said, "So let's talk about the money laundering counts quickly. Obviously, the defense has not really contested these. And we agree that the defendant is, in fact, guilty of these counts." (03/11/14 Tr. 1322:1-4.)

#### 4. Felon in Possession of a Firearm

Finally, the Government presented evidence that Price was a felon in possession of a firearm. In October 2011, William Desmond, an IRS Special Agent, searched Price's Country Club Hills home and located a firearm in the drawer of a nightstand in the master bedroom. (03/07/14 Tr. 956:11-14, 981:17-982:11.) The serial numbers were scratched off. (*Id.* at 982:19-20.) Multiple witnesses also testified that they saw Price with the firearm at that location. (*Id.* at 822:12-823:17, 998:16-999:5.)

### C. Jury Verdict

Evidence concluded on March 11, 2014, and the jury began deliberations that day. (03/11/14 Tr. 1375:25, 1402:11.) The jury returned guilty verdicts with respect to all charges the next day, March 12, 2014. (03/12/14 Tr. 1405:3-1406:19.)

#### 1. Post-Trial

On June 25, 2014, the defense filed consolidated post-trial motions. (Consolidated Post-Trial Mots., Dkt. No. 107.) The consolidated filing included a motion for a new trial based on (1) the Court's refusal of a proposed buyer-seller jury instruction

and (2) the Court's admission of unfairly prejudicial evidence concerning the shooting of James Brown over the defense's objection. (*Id.* at 1–4.) The defense also included a motion for a judgment of acquittal, arguing that the evidence was equally supportive of guilt and innocence. (*Id.* at 4–6.) On December 8, 2014, the Court denied Price's post-trial motions. (12/08/14 Order, Dkt. No. 115.)

On August 21, 2014, defense counsel Brindley was indicted on federal criminal charges unrelated to Price's case. Indictment, United States v. Brindley, No. 14-CR-00468 (N.D. Ill. Aug. 21, 2014), Dkt. No. 1. On November 6, 2014, the Court held a hearing to set a sentencing date and address potential conflicts of interest stemming from Brindley's indictment. (11/06/14 Tr. 2:11–16, Dkt. No. 182.) The Court informed Price of the indictment and of the potential conflicts of interest that could result therefrom. (*Id.* at 3:11–17.) Price indicated that he reviewed the potential conflicts with Brindley and understood the risks. (*Id.* at 3:18–21.) Nonetheless, Price told the Court that he still wished to have Brindley continue as his attorney. (*Id.* at 3:25.)

### *2. Sentencing*

On August 4, 2017, Price filed a handwritten pro se memorandum of understanding. (08/04/17 Mem., Dkt. No. 138.) Price admitted his guilt to the money laundering counts and maintained his

- 12 -

innocence as to the rest of the charges. (*Id.* at 1, 7.) He sought from the Court a sentence of 120 months of incarceration and sixty months of supervised release. (*Id.* at 7.) In consideration of the request, Price asked the Court to acknowledge his "acceptance of responsibility for the multiple money laundering counts, which Price expresses his sincere remorse for." (*Id.*)

At the sentencing hearing on August 10, 2017, the Government introduced evidence that Greg Holden ("Holden"), one of Price's co-conspirators, was murdered by Price in December 2011 for cooperating with the Government's investigation. The Court found by a preponderance of the evidence that Price shot and killed Holden. (08/10/17 Tr. 328:15–18, Dkt. No. 173.) The Court also found beyond a reasonable doubt that Price ordered the shooting of James Brown in response to Price's suspicion that Brown was also cooperating with the Government. (*Id.* at 328:18–19.) Lastly, the Court found beyond a reasonable doubt that Price ordered the shooting of Mokece Lee, although it ultimately did not occur. (*Id.* at 328:19–21.) Based on the foregoing, the Court determined that Price was subject to an offense level of 43 and a criminal history category of II, resulting in a guidelines sentence of life in prison. (Statement of Reasons at 1, Dkt. No. 152.) The Court ultimately sentenced Price to thirty-seven years' incarceration and ten years' supervised release. (*Id.* at 333:8–10.)

On September 26, 2017, the Court held a hearing during which it ruled on the Government's motions for restitution and forfeiture. (09/26/17 Tr. 2:6-9, Dkt. No 167.) The defense had the opportunity to respond to the motions but failed to do so. (*Id.* at 2:24-25.) Defense counsel was absent from the hearing, and the Court granted the Government's motion in counsel's absence but Price's presence. (*Id.* at 2:10-3:23.) The Court stated that the defense could file motions to reconsider at a later date. (*Id.* at 3:13-15.) The Court ordered Price to pay restitution to Greg Holden's family and forfeit his interest in property and money. (*Id.* at 3:13-23.)

### D. Price's Appeal to the Seventh Circuit

In 2018, Price appealed (1) the Court's order that he pay restitution to Greg Holden's family and (2) errors in the presentence report. *United States v. Price*, 906 F.3d 685, 687 (7th Cir. 2018). The Seventh Circuit affirmed the Court's sentence and restitution order. *Id.*

Price first argued that the Court lacked authority to order restitution to the Holden family because restitution is statutorily prohibited for a participant of the offense charged, and Holden was Price's co-conspirator. *Id.* at 689. The Seventh Circuit affirmed the restitution order, clarifying for Price that the restitution was not paid to Holden's estate but to his family

members who were harmed by Holden's murder and not identified as his co-conspirators. *Id.* The Court's order, therefore, did not violate the statute. *Id.* at 690.

Price's second argument was based on the fact that his two prior misdemeanor convictions, both of which resulted in a sentence of probation for one year or less, were included in his criminal history calculation during sentencing. *Id.* The Seventh Circuit agreed that the calculation was an error but affirmed the sentence "because the advisory sentence at Price's offense level was life imprisonment regardless of the applicable criminal history category, and because the district judge departed downward from the Guidelines with a sentence of 37 years' imprisonment." *Id.* Thus, the error did not prejudice Price's substantial rights. *Id.*

Price filed this petition for relief pursuant to 28 U.S.C. § 2255 on February 18, 2020. (Civ. Dkt. No. 1.)

## II. <u>LEGAL STANDARD</u>

Under 28 U.S.C. § 2255, a federal prisoner "may move the court which imposed the sentence to vacate, set aside, or correct the sentence." The petitioner must prove that his "sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(b). Relief under this section is reserved for "extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has

occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

### III.  DISCUSSION

Pursuant to § 2255, Price moves for the Court to vacate his conviction and sentence based on the ineffective assistance of counsel. A petitioner arguing ineffective assistance of counsel must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687. An attorney's performance is deficient if it falls "below an objective standard of reasonableness" and is evaluated according to the facts and circumstances as they existed at the time of the attorney's conduct. *Id.* at 688-690. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Second, the petitioner must show that counsel's error prejudiced the defense in a way that "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 692, 694. A showing that an attorney's error had "some conceivable effect" on the verdict is not enough; there must be a "reasonable probability" that, but for the error, "the result of the proceeding would have been different." *Id.* at 694. The Court is not bound by a particular order in which to evaluate an ineffectiveness claim. *Id.* at 697.

"If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

Price argues his representation was constitutionally deficient with respect to six topics: (1) counsel's improper concession of guilt; (2) counsel's failure to object to evidence of Price's involvement in the shooting of a co-conspirator; (3) counsel's failure to object to the constructive amendment of the indictment; (4) counsel's failure to object to the government's fingerprint evidence; (5) counsel's failure to withdraw from representation after a conflict of interest arose; and (6) counsel's absence at a hearing for restitution and forfeiture. The Court addresses each below.

## A. Defense Counsel's Strategic Concession of Guilt

Criminal defendants have the exclusive right to decide whether to plead guilty. *McCoy v. Louisiana*, 138 S.Ct. 1500, 1508 (2018). Whereas counsel has leeway in the "strategic choices about how best to *achieve* a client's objectives," maintaining innocence is one of those choices "about what the client's objectives in fact *are*." *Id.* An attorney's concession of guilt to certain counts of a multi-count indictment to "bolster the case for innocence on the remaining counts" is a permissible trial strategy when the record contains evidence of the defendant's consent to the

strategy. *United States v. Holman*, 314 F.3d 837, 840–41 (7th Cir. 2002). If a defendant expressly objects to a partial admission strategy and wishes to maintain his innocence, counsel must abide by those wishes. *McCoy*, 138 S.Ct. at 1509.

Price objects to both instances where his attorney used a concession strategy at trial. Price argues these admissions constituted ineffective assistance of counsel because "the record clearly demonstrates that [Price] did not desire to admit guilt to any portion of the indictment." (Mem. at 12, Civ. Dkt. No. 3.) During opening statements, Price's defense counsel first admitted to Price's involvement in the purchase and sale of heroin but argued that Price's conduct was done individually rather than as part of a conspiracy. Price alleges that he privately objected to the strategy to admit partial guilt to counsel but was told to "trust them" and not object in court. (Mem. at 14.) Second, defense counsel's opening statement offered that Price expected to be found guilty of the money laundering charges, which Price states was also against his wishes. The Court examines both disputed concessions in turn.

A defense counsel's complete concession of guilt without a defendant's consent "nullifies [a defendant's] right to have the issue of his guilt or innocence presented to the jury as an adversarial issue and therefore constitutes ineffective

assistance." *United States v. Simone*, 931 F.2d 1186, 1196 (7th Cir. 1991) (quoting *Francis v. Spraggins*, 720 F.2d 1190, 1194 (11th Cir. 1983)). However, when admissions do not actually concede guilt, "counsel's concessions have been treated as tactical retreats and deemed to be effective assistance." *Id.* Here, Price's counsel did not admit his guilt to a drug crime for which he had been indicted. Instead, Price's counsel admitted that Price purchased and sold heroin in an individual capacity and consistently denied that Price was involved in a conspiracy (the drug crime for which he was indicted). Counsel's defense theory throughout trial was that Price was charged with the wrong crime; while Price was guilty of bare possession and distribution of heroin, he should be found not guilty because the government only charged him with conspiracy. Counsel told the jury, "[H]e's not guilty of [conspiracy] because of the nature of the law, the poor charging decisions of the United States, and inconsistent and dishonest testimony." (03/11/14 Tr. 1362:7-10.) Because Price was not charged with the drug crime to which counsel conceded guilt, Price's argument fails for lack of deficient performance under *Strickland*. *See Simone*, 931 F.2d at 1196.

Price's ineffectiveness claim also fails because Price ratified his counsel's partial admission strategy. Price provides the following narrative of events:

> When Movant objected and complained to his Trial
> Counsels, as to why they were telling the jury that he
> was in fact guilty of Drug Dealing with others and of
> Money Laundering, Trial Counsel Brindley told Movant to
> trust them and NOT object to this Honorable Court,
> because this was his best shot at winning his case by
> raising the same in his Post-Conviction Motion.

(Mem. at 14.) In his motion, Price relies upon *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018), which holds that a counsel who is aware of a defendant's express objections to any admission of guilt and then proceeds to concede guilt before the jury violates the defendant's right to effective assistance of counsel. *Id.* at 1509. In *McCoy*, the attorney admitted that the defendant was "furious" when he learned of the attorney's plan to concede guilt to the crimes charged at trial. *Id.* at 1506. After hearing defense's strategy, the defendant continued to insist that counsel pursue innocence, but counsel disregarded the defendant's wishes and admitted guilt during opening statements. *Id.* at 1505-07. The defendant objected to counsel's conduct on the record. *Id.* at 1506.

Price, on the other hand, did not object on the record to his attorney's concession of guilt during opening or closing statements. (*See* 03/04/14 Tr. 184:21-195:12; 03/11/14 Tr. 1324:2-1365:3.) The only conversation Price cites as an objection to counsel's strategy is the same conversation in which he seemed to have taken counsel's advice by withholding objections in the hope that it would lead to a favorable outcome in post-conviction

proceedings. As stated in *Strickland*, judicial review of counsel's performance is highly deferential, in part, because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689. Price questioned counsel's strategy but, after further explanation, must have agreed that the partial admission was his best chance at post-conviction relief because he failed to object in court after counsel emphasized the theory repeatedly throughout trial. Consequently, Price cannot now successfully claim ineffective assistance of counsel solely because the strategy to which he acquiesced proved unsuccessful.

For the same reasons, counsel's concession of Price's guilt as to the money laundering charges also fails to create a claim for ineffective assistance of counsel under *Strickland* and *United States v. Simone*, 93 1 F.2d 1186 (7th Cir. 1991). In *Simone*, a defendant on trial for a drug conspiracy brought an ineffectiveness claim based on his attorney's concession at trial that the defendant sold drugs independently as opposed to as part of a conspiracy. *Id.* at 1194. The court, however, found that the defendant consented to the trial strategy, thus barring his claim, when he personally sent the court a handwritten letter that made clear that the defendant's position was also that he sold drugs independently. *Id.* at 1196. Based on the letter, the court found

that the defendant's attorney conducted the defense according to the defendant's wishes. *Id.*

Similarly, Price sent the Court a handwritten memorandum of understanding that said, "Price further seeks the Court acknowledge Price's acceptance of responsibility for the multiple money laundering counts, which Price expresses his sincere remorse for." (08/04/17 Mem. at 7.) Price's letter set forth a strategy that was identical to that of his trial attorney — Price was guilty of money laundering. As a result, Price's ineffectiveness argument fails for lack of deficient performance under *Strickland* because Price's letter evinced his consent to his attorney's concession of guilt of money laundering.

### B. Shooting Evidence

Price next contends that his right to the effective assistance of counsel was violated based on the admission of evidence that Price was involved in the shooting of a co-conspirator. Price's argues that his defense counsel should have objected to the evidence and should not have asked the Court to question potential jurors about their ability to remain impartial if evidence of a shooting were introduced at trial. The Court addresses each in turn.

A review of the record reveals that defense counsel made the following objection at trial regarding the admittance of the shooting evidence:

> I believe the government intends to introduce evidence that Mr. Brown was shot and then through subsequent cooperators, introduce evidence that Mr. Price had something to do with the shooting because Mr. Brown owed Mr. Price money. It's our position, Judge, that this evidence is unfairly prejudicial. The prejudicial impact of bringing up a shooting in a drug conspiracy case of this kind far outweighs any probative value that it would have in terms of establishing the actual conspiracy.

(03/05/14 Tr. 256:25-257:8.) Despite the objection, the Court admitted the evidence. Defense counsel later submitted a post-trial motion for a new trial based in part on the Court's admission of the shooting evidence. The post-trial motion argued that the evidence was unfairly prejudicial to Price and raised doubts about the reliability of the jury verdict. The Court also denied the post-trial motion. Because Price's defense counsel objected to the admittance of the shooting evidence multiple times, Price's counsel cannot be considered ineffective on this basis. Further, the Court properly admitted the evidence despite Price's counsel's objections. Therefore, there is no claim for ineffective assistance on this basis.

Price's also objects to defense counsel's request that the Court question the jurors' impartiality. Price does not cite any case law to support his position, nor does he offer facts that

fully demonstrate how the questioning could have caused him prejudice. To the contrary, counsel's questions were probative of the jurors' ability to remain impartial when presented with properly admitted evidence. The Court therefore finds no reason to conclude that the questions were in error or that Price suffered any prejudice as a result.

### C. Constructive Amendment of the Indictment

Price next argues that counsel was ineffective based upon defense counsel's failure to object to the constructive amendment of Price's indictment. Price states the following:

> A constructive amendment of an indictment occurs when an indictment's terms are effectively altered by the presentation of evidence and jury instructions that so modify essential Elements of the Offense charged that there is a substantial likelihood that the defendant was convicted of an offense other than that charged in the indictment.

(Mem. at 21.) Price relies solely upon the definition of "constructive amendment" and the elements of a drug conspiracy and money laundering to support his position. (*Id.*) Furthermore, he mentions that convictions for conspiracies to commit money laundering and drug conspiracy do not require proof of an overt act. (*Id.*) Price supports his position with merely conclusory statements and does not offer any additional arguments or facts.

As explained in *Argyropoulos v. City of Alton*, 539 F.3d 724 (7th Cir. 2008), conclusory statements unsupported by evidence in

the record invites the Court to disregard the claim at issue. *Id.*
at 739. Price did not support his conclusion that his indictment
was constructively amended with facts from the record. As a result,
his claim is undeveloped and unsupported such that the court cannot
fully review it. Price's ineffective assistance claim based on a
constructive amendment fails.

### D. Fingerprint Evidence

Price next argues that counsel's stipulation to the
Government's fingerprint evidence without objection or further
investigation constitutes ineffective assistance of counsel. Price
relies on *United States v. Saunders*, 826 F.3d 363 (7th Cir. 2016),
which is separate from but related to Price's case. The *Saunders*
defendants were charged separately but alleged to be part of
Price's drug conspiracy. *Id.* at 365. The fingerprint expert at
issue in *Saunders* is the same expert that testified in Price's
trial. (*Id.* at 366; 03/10/14 Tr. 1026:11–1042:24.)

In *Saunders,* the Government filed a Rule 16 disclosure that
explained the analysis, comparison, evaluation, and method the
expert used to determine that two fingerprints were a match.
*Saunders,* 826 F.3d at 366. The disclosure, however, lacked an
explanation of the number of points of verification that the expert
used to determine a match. *Id.* The Seventh Circuit concluded that
"[w]hatever standard a fingerprint expert chooses to use to

determine a match . . . the basis for the opinion that two prints are a match must be disclosed, upon the defendants' request." *Id.* at 370. Despite finding that the trial court erred in admitting the fingerprint evidence, the Seventh Circuit subsequently held that it did not prejudice the defendants in light of the weight of the Government's evidence against them at trial. *Id.*

As an initial matter, Price's case is distinguishable from *Saunders*. Federal Rule of Criminal Procedure 16 only requires a summary of expert testimony "[a]t the defendant's request." FED. R. CRIM. P. 16(g). Here, however, Price's counsel did not make a disclosure request; therefore, the government's duty to make a Rule 16 disclosure detailing the bases for the fingerprint expert's opinion was not triggered. Consequently, there was no deficient Rule 16 disclosure to which counsel failed to object.

Even if the Government were required to make a Rule 16 disclosure and counsel did make an error, Price's case was not prejudiced. The *Saunders* court found that, even though the trial court improperly admitted fingerprint evidence connecting the defendants to fingerprints on heroin mixing and packaging materials, the existence of other overwhelming evidence of guilt rendered the error harmless. *Saunders,* 826 F.3d at 370. Some of this "other evidence" included surveillance footage from Up Top,

physical evidence from the CPD trash pulls, and the testimony of co-conspirators. *Id.*

The *Saunders* defendants were two of Price's co-conspirators, which resulted in an overlap in evidence between the two trials. Consequently, the "other evidence" that the *Saunders* court relied upon to conclude that the admission of the fingerprint evidence was a harmless error was also presented in Price's case. Other evidence against Price included surveillance footage from Up Top showing Price entering the apartment with a key, Price's fingerprints on physical evidence from CPD trash pulls, and the testimony of his co-conspirators. (*See, e.g.,* 03/04/14 Tr. 210:19–211:7; 03/05/14 Tr. 262:20–263:7, 442:4–443:10; 03/06/14 Tr. 713:20–714:9; 03/10/14 Tr. 1042:15–22.) Because this is the same evidence upon which the Seventh Circuit based its decision in *Saunders*, *see* 826 F.3d at 370, even if Price's attorney erred by stipulating to the fingerprint evidence, the error was harmless.

### E.  Failure to Withdraw as Counsel

Price next claims that he was deprived of the effective assistance of counsel because his attorney was under federal criminal investigation and, as a result, harbored a conflict of interest that harmed Price's defense. The Court addressed these potential conflicts with Price during a status hearing for post-trial motions. The following exchange occurred:

> THE COURT: Mr. Price, I understand you're familiar with
> the matters that involve Mr. Brindley.
> THE DEFENDANT: Yes, sir.
> THE COURT: You understand he's been indicted in a case
> that's presently pending in court. Do you understand
> that?
> THE DEFENDANT: Yes, sir.
> THE COURT: There's a potential conflict of interest
> because of that. The potential as I understand the
> conflict is that Mr. -- a lawyer who is under criminal
> investigation or indictment may seek to curry favor with
> the prosecutor by not pressing the case as hard as a
> person would; in other words, not taking full advantage
> of every possible loophole or whatever. Do you
> understand that?
> THE DEFENDANT: Yes, sir.
> THE COURT: So you've gone over that with Mr. Brindley;
> is that correct?
> THE DEFENDANT: Yes, sir.
> THE COURT: Do you with to have Mr. Brindley continue as
> your attorney, or do you wish the Court to appoint
> someone else to represent you?
> THE DEFENDANT: I will continue.

(11/06/14 Tr. at 3:4-25.)

The Seventh Circuit has made clear that "[a] defendant who knowingly and intelligently waives his attorney's potential or actual conflict of interest may not, under any circumstances, later claim that such a conflict deprived him of his right to effective assistance of counsel." *Harvey v. McCaughtry*, 11 F.3d 691, 695 (7th Cir. 1993). A defendant makes a knowing and intelligent waiver if it is made with "sufficient awareness of the relevant circumstances and likely consequences." *United States v. Lowry*, 971 F.2d 55, 60 (7th Cir. 1992) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). The defendant must make an informed

choice that allows him to understand the risks and benefits of continued representation by counsel. *Id.* at 60–61.

In *United States v. Lowry*, the defendant learned that defense counsel was under federal criminal investigation. 971 F.2d at 59. The investigation raised potential conflicts of interest, including that the attorney would "refrain from aggressive cross-examination during the trial in order that he might gain the favor of his potential prosecutors, or that he would be unduly hostile toward them, losing objectivity, and thus harm [the defendant]'s rapport with the jury." *Id.* at 61. The defendant waived the conflict of interest, but, on appeal after his conviction, argued that his waiver was not knowing and intelligent and thus invalid. *Id.* The trial court informed the defendant on the record that counsel was under investigation and that the investigation presented the risk that counsel may attempt to either curry favor with or show aggression to the prosecution. *Id.* at 62. On appeal, the Seventh Circuit held that the defendant possessed enough information to appropriately weigh the risks and benefits of the continued representation by that attorney. *Id.* "The court's role is to ensure that the defendant has been informed of the nature of the conflict of interest and the risks inherent in the conflict, and the court may exercise its discretion in fulfilling that role."

*Id.* at 63. The defendant's waiver was knowing and intelligent and he forfeited any claim of ineffective assistance. *Id.*

Like the trial court in *Lowry*, this Court fully explained to Price the risk that, because counsel was under federal criminal investigation, counsel could use Price's trial to curry favor with the prosecution for counsel's own criminal matters. Price knowingly and intelligently waived the conflict of interest after he obtained enough information from the Court to weigh the risks and benefits. Price cannot now successfully claim ineffective assistance of counsel because of that same conflict.

### F. Counsel's Absence at Hearing for Restitution and Forfeiture

Finally, Price argues that counsel's physical absence at a hearing for restitution and forfeiture constitutes ineffective assistance of counsel. The second *Strickland* prong requires a showing of prejudice before an attorney's error is deemed ineffective assistance, with one exception. *McDowell v. Kingston*, 497 F.3d 757, 761 (7th Cir. 2007). A court is to presume prejudice where there is a complete denial of counsel at a critical stage of a criminal proceeding, which is limited to instances in which counsel is physically absent. *Id.* at 762. A critical stage of a criminal proceeding "is one where potential substantial prejudice to defendant's rights inheres in the particular confrontation and

where counsel's abilities can help avoid that prejudice." *United States ex rel. Thomas O'Leary*, 856 F.2d 1011, 1014 (7th Cir. 1988).

The Court need not reach the issue of whether restitution and forfeiture hearings constitute "critical stages" in a criminal proceeding because "relief under § 2255 is limited to issues of custody and liberty." *Murphy v. United States*, No. 07 C 3804, 2009 WL 424490, at *6 (N.D. Ill. Feb. 17, 2009). "[L]egal issues that do not affect a liberty right are heard by the federal courts only through direct appeal. This is true even if a prisoner has alleged ineffective assistance of counsel in relation to the property issues raised before the trial court." *Id.* On August 10, 2017, the Court sentenced Price to thirty-seven years' incarceration. (08/10/17 Tr. 333:8-9.) Counsel was present at this hearing. (*Id.* at 269:4.) More than a month later, the Court granted the Government's motion for restitution and forfeiture. (09/26/17 Tr. 3:13-23.)

Because Price's custodial sentence was not impacted by the Court's orders for restitution or forfeiture, a § 2255 motion is improper grounds for relief as to Price's financial matters. *See Murphy*, 2009 WL 424490 at *6 (holding that, because the defendant's sentence was unrelated to the court's forfeiture findings, the issue of custody was not before the court).

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Price's § 2255 Petition is denied, and the Court declines to grant him a Certificate of Appealability.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 7/7/2021